**In the Matter of Royce Edward TOLLEY, Attorney-Respondent.**

**Nos. 97SA468, 98SA508.**

Supreme Court of Colorado,
En Banc.

March 29, 1999.

---

Linda Donnelly, Attorney Regulation Counsel, Kenneth B. Pennywell, Assistant Attorney Regulation Counsel, Denver, Colorado, for Complainant.

Linda Sommers Green, Lakewood, Colorado, Attorney for Attorney–Respondent in No. 97SA468

Royce Edward Tolley, Pro Se in No. 98SA508, Denver, Colorado

PER CURIAM.

These lawyer discipline cases come before the court on two separate stipulations, agreements, and conditional admissions of misconduct. *See* C.R.C.P. 241.18. Both conditional admissions were approved by an inquiry panel of the supreme court grievance committee. In No. 97SA468 the inquiry panel recommended that the respondent be suspended for thirty days from the practice of law. In No. 98SA508, the respondent has agreed to disbarment, with readmission conditioned on certain restitution. We accept the conditional admissions and order that the respondent be disbarred.

## I. No. 97SA468

The respondent, Royce Edward Tolley, was admitted to practice law in this state in 1983. He was immediately suspended from the practice of law on April 16, 1998, pending the outcome of proceeding No. 98SA508. According to the conditional admission in No. 97SA468, Aquavac West Locators, Inc. d/b/a/ Underground Utilities Services, Inc. ("U2SI"), is in the business of locating underground utilities. U2SI hired the respondent in 1992 regarding a legal matter involving its corporate structure. The original shareholders of U2SI were Robert Bangerter and F.E. Trujillo. In 1992, they decided to allocate 10% of the ownership interest to the respondent to serve as legal counsel and corporate secretary, and another 10% to Juan Trujillo to serve as marketing vice-president.

It later became obvious that U2SI needed more capital to maintain its growth. In early 1993, Tolley suggested that Alan Neel, M.D., was interested in investing in U2SI. Dr. Neel agreed to invest $100,000 for a 10% interest in U2SI. The respondent prepared a unanimous consent signed by all the shareholders which showed the following allocation of U2SI's 100,000 shares: 42,500 to F.E. Trujillo; 29,500 to Bangerter; 10,000 to Dr. Neel; 9,000 to Juan Trujillo; and 9,000 to the respondent. Tolley wrote a check on Dr. Neel's behalf in the amount of $25,000 for his initial investment to U2SI. The allocations were recorded in the company's certification book, but no shares were issued at that time. Tolley did not prepare a promissory note for Dr. Neel, and no agreement was reached regarding the payment schedule for the remaining $75,000 or for interest thereon. As a result, Dr. Neel made no additional payments for his 10,000 shares.

The respondent himself received over $15,000 as loans from U2SI over and above his salary. However, no promissory notes were prepared to evidence these loans, Tolley gave no security for them, and no schedules for repayment were agreed to.

Tolley also contacted Grant Marsh about investing in U2SI, and Marsh suggested that Anschutz Corporation might be interested in such an investment because of its own needs for locating utilities. Marsh agreed to talk to his friend Doug Polsen who was the chief financial officer at Anschutz. Later in 1993, Marsh arranged for Anschutz personnel to view demonstrations of U2SI's operation. In December 1993, a subsidiary of Anschutz, SPT, sent a letter expressing its interest in investing in U2SI, and proposing a joint venture in which SPT would hold 51% and U2SI 49%. Also in December, Marsh demanded a share of U2SI equal to that of F.E. Trujillo and Bangerter, who found that unacceptable and no resolution was reached. On the day set for closing on the joint venture, F.E. Trujillo and Bangerter asked Marsh to sign a statement agreeing to only a 5% ownership interest in U2SI, but he refused. Tolley believed that an agreement for more compensation had previously been reached.

The officers and directors of U2SI attended the closing on April 20, 1994 and signed the appropriate documents. Questions had arisen, however, concerning some of the financial information provided by U2SI, including outstanding employee taxes, and Polsen told them that Anschutz would not sign the joint venture documents until an audit had been conducted.

That same afternoon, against the express instructions of his clients, U2SI and its shareholders, Tolley informed Polsen that no deal had in fact been reached regarding Marsh's compensation, and that Anschutz had been defrauded but that he would try to resolve it in a few days. He also suggested that Anschutz would have some kind of legal recourse against U2SI. The next day, again against the express wishes of his clients, the respondent left a message on Marsh's voice mail indicating that if the U2SI officers did not issue Marsh's stock within the next three weeks, "we're just going to have to initiate a lawsuit, because this isn't right."

After receiving the results of the audit, Anschutz formally declined to enter into the venture on May 16, 1994. Tolley then resigned his positions at U2SI. He contacted various individuals, including Marsh, for a proposed joint venture with U2SI, which U2SI declined. Marsh subsequently filed an action against U2SI and its shareholders seeking compensation for his efforts involving Anschutz. F.E. Trujillo, Bangerter, and Juan Trujillo filed cross-claims against the respondent. In a letter dated June 8, 1994, Tolley notified the other shareholders that he had received the complaint in Marsh's action; that he would not be defending U2SI in that proceeding; and that the shareholders should obtain their own counsel. He also informed them that Dr. Neel and he intended to answer the complaint together. Nevertheless, he later directly communicated with the other shareholders with offers to settle despite the fact that they and U2SI were represented by their own lawyer. All claims in the Marsh lawsuit have now settled.

The respondent has admitted that by directly contacting the other shareholders about settling the action and the cross-claims against him, he violated Colo. RPC 4.2 (communicating about the subject of the representation with a party the lawyer knows to be represented by another lawyer). Because he failed to document the amounts Dr. Neel owed on his investment, he did not provide competent representation to U2SI, contrary to Colo. RPC 1.1. By placing his own or Marsh's interests above the interests of his clients, the respondent violated Colo. RPC 1.7(b) (representing a client when the representation may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests). The respondent's interest-free and security-free loans from his client were not clearly fair and reasonable to the client, and were therefore obtained in violation of Colo. RPC 1.8(a). Finally, the respondent violated Colo. RPC 1.8(b) (using information relating to the representation of a client to the client's disadvantage) by informing Polsen and Marsh of their rights to file an action against U2SI based on fraud.

## II. No. 98SA508

The second case involves more serious misconduct and demonstrates that Tolley should be disbarred, as he admits.

## A. Mary Bloomquist

In June 1993, Tolley asked for a $15,000 loan from Mary Bloomquist, a friend and client. Bloomquist loaned Tolley $15,000 on June 17, 1993, based on Tolley's promise that he would be able to repay the money in two or three weeks. The loan was needed to complete a swimming pool for a club that Tolley was developing in Larkspur, Colorado. He gave Bloomquist a check for $15,000 on June 21, 1993, which, according to Tolley, "represented security on the repayment of the loan." He asked Bloomquist to forego depositing the check until the club was sold. After Tolley stopped communicating with her, Bloomquist wrote him several letters over three years about the loan, but she received no answer. Bloomquist has never cashed Tolley's check.

Although Tolley indicates that the loan was evidenced by a promissory note, he is not able to produce it. He did not advise Bloomquist when she made the loan to have independent counsel review the terms of the loan, nor is there any written consent to the transaction.

In June 1996, Bloomquist filed an action against Tolley to recover the amount he owed her. Following a series of delaying tactics on Tolley's part, the court granted summary judgment in September 1996 in favor of Bloomquist in the amount of $19,451.69, including principal, interest, and costs. On December 17, 1997, Tolley paid $12,000 on the judgment, but still owes about $7,450 plus statutory interest.

Tolley has admitted that his conduct violated Colo. RPC 1.8(a), which provides:

(a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

(1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;

(2) the client is informed that use of independent counsel may be advisable and is given a reasonable opportunity to seek the advice of such independent counsel in the transaction; and

(3) the client consents in writing thereto.

By obtaining the funds through a misrepresentation that a sale of the club was imminent and succeeding in having Bloomquist forebear in cashing his check, Tolley violated Colo. RPC 8.4(c). Finally, his dilatory conduct in connection with the collection case violated Colo. RPC 8.4(d) (engaging in conduct prejudicial to the administration of justice) and 8.4(h) (engaging in conduct that adversely reflects on the lawyer's fitness to practice law).

## B. The Brandt Matter

On April 20, 1997, Tolley, individually and as president of Construction Foundation Partners, Inc., entered into an escrow agreement with William Cardie, individually and as chief executive officer of the Fore Group. Tolley was selected as the escrow agent because he was an attorney and the funds could be placed in his trust account, which was important for the Fore Group's peace of mind. Tolley gave written assurances that the funds would not leave his trust account without the Fore Group's written permission and could not be used for any purpose other than as provided in the escrow agreement. The purpose of the agreement was to give Tolley funds to invest to leverage U.S. Treasury investments.

The Fore Group wired $2.5 million to Tolley's trust account on April 22, 1997, at the Castle Rock Bank. An additional $1 million from a separate trust account maintained by the Fore Group was deposited in Tolley's trust account. The investment plan was not realized, however, and the escrow agreement explicitly provided that, in that event, Tolley was to immediately wire transfer the Fore Group's funds back to it. Tolley returned $2.5 million to the Fore Group, but the Group sought an alternative transaction for the remaining $1 million, and Tolley sent $500,000 to a third party on the Group's behalf. When the Fore Group demanded return of the remaining $500,000, it discovered that Tolley had invested the funds in a gold trad-

ing program. Although Tolley asserts that he had Cardie's permission to invest the funds as he saw fit, the Fore Group denies that Tolley had its permission to unilaterally invest the funds.

When the Fore Group renewed its demand for the return of the funds, Tolley issued a check to the Group drawn on his personal checking account in the amount of $500,000. After being presented for payment twice, the check was returned due to insufficient funds. As of August 1998, Tolley had not repaid the $500,000.

Tolley's conduct violated Colo. RPC 8.4(b) (committing a criminal act that reflects adversely on a lawyer's honesty), 8.4(c) (engaging in conduct involving dishonesty, deceit, fraud or misrepresentation); as well as C.R.C.P. 241.6(5) (committing a criminal act).

### C. The Arapahoe County and Fulton Matters

In January 1997, the Berthoud Colorado Bondholders' Committee (the Berthoud Committee), the Mount Carbon Metro District Bondholders' Committee (the Mount Carbon Committee), and Gregory and Ann Fulton filed a complaint in Arapahoe County District Court against the respondent and one Gwyn Saylor. The complaint alleged the following:

1. The Berthoud Committee was formed for the purpose of restructuring certain debt and ensuring that the bondholders were repaid their principal. The Mount Carbon Committee was formed to reconstitute the Mount Carbon Metropolitan District so that bondholders were eventually paid their principal.

2. Tolley represented both committees at all relevant time periods.

3. On or about April 12, 1995, the Berthoud Committee gave Tolley $7,500 to be placed in his trust account to be used for the committee's purposes. Tolley commingled these funds and then knowingly misappropriated them for his own use.

4. Tolley received $12,500 pursuant to an order of the Arapahoe County District Court dated October 24, 1995, directing him to place the funds in his trust account "to be used solely for the purpose of attempting to reconstitute the Mount Carbon Metropolitan District by whatever means necessary so as to make the lots available for sale and to ensure that the bondholders are eventually paid their principal." Instead, Tolley commingled the funds with his own money and then spent them for his own personal use.

The complaint also alleged that on April 1, 1995, Tolley and Saylor as makers delivered a promissory note in the amount of $35,000 to Gregory Fulton. The note contained terms relating to the payment, interest, and recovery of attorney fees in the event of default. Fulton was not informed, however, of the advisability of seeking independent legal advice; nor did he consent to the loan in writing.

On September 26, 1995, Tolley gave Ann Fulton a check for $20,000, drawn on his "Attorney at Law" account which was returned for insufficient funds. Although demand has been made on Tolley to make the check good, he has not done so.

On September 27, 1995, Tolley borrowed $20,000 from Ann Fulton. He has paid back only $8,000. Tolley borrowed the $20,000 without reducing the terms of the loan to writing; without advising Ann Fulton to obtain independent advice; and without obtaining her consent to the loan in writing.

On October 19, 1995, Tolley delivered to Gregory Fulton a promissory note for $20,000. Tolley has paid nothing on the note and it is in default. Again, Tolley failed to inform Fulton of the advisability of seeking independent legal advice, and Fulton did not consent to the loan in writing.

Tolley assigned an interest in May 1996 in the Echo Hills Pool and Tennis Club in Larkspur, ostensibly to secure the April 1, 1995 promissory note to Gregory Fulton. However, when he assigned his interest in the club it was subject to a deed of foreclosure entered in March 1996. On May 24, Tolley sent Gregory Fulton what appeared to be a contract for the sale of the club, and which was executed by the seller "Echo Hills Residences, LLC, By: Royce Edward Tolley, President." The sale was in fact never consummated. Nevertheless, Tolley wrote to Fulton in July 1996 that $25,000 was held in

escrow for repayment of his obligations, including his obligations to Fulton. No such funds have ever been released.

Then, on August 8, 1996, Tolley wrote to Fulton and informed him that at the closing on the Echo Hills property, he would place $750,000 with a title company for disbursement to several individuals, including Fulton. The disbursement never occurred.

In summary, Tolley made representations to Fulton and others that the funds entrusted to him were being held in his trust account and were available for use by the Berthoud Committee. When it was discovered that the funds were not in his trust account, Tolley represented that certain sales, loans, assignments, and so forth would take place which would ensure the safety and replacement of the funds. Because Tolley misappropriated the funds for his own use, however, his representations were false.

Judgment in the Arapahoe County civil case was entered in favor of the plaintiffs and against Tolley on May 30, 1998, in the amount of $47,000 actual and $80,000 punitive damages. As of August 1998, Tolley had taken no steps to satisfy this judgment.

Tolley has stipulated that the foregoing conduct violated Colo. RPC 1.8(a) (entering into a prohibited business transaction with a client); 8.4(b) (committing a criminal act that adversely reflects on a lawyer's fitness to practice); 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation); and C.R.C.P. 241.6(5) (committing a criminal act).

### D. The Read Matter

In late 1992 or early 1993, Mr. and Mrs. Read retained Tolley to pursue copyright claims on behalf of their family business, the Holly Berry House. The Reads paid Tolley a $1,000 flat fee. In September 1997, Tolley told the Reads that the case had not gone anywhere because he had not given it the attention it deserved and he agreed to refund their $1,000 fee. Tolley issued a check for $1,000 to the Reads on September 21, 1997, but the check was returned for insufficient funds. When he wrote the check, Tolley knew or should have known that he did not

have the funds to cover the check. Tolley refused to respond to further inquiries from the Reads.

Tolley has admitted that he violated Colo. RPC 1.3 (neglecting a legal matter); 1.4(a) (failing to communicate with a client); 8.4(b) (committing a criminal act that adversely reflects on a lawyer's fitness to practice); 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation); and C.R.C.P. 241.6(5) (committing a criminal act).

### E. The Gross Matter

Bill and Everett Gross performed various construction services for Tolley in connection with the Echo Hills Swim and Tennis Club. Tolley had also served as their lawyer in certain corporate and litigation matters. On January 18, 1996, Tolley wrote a check for $9,000 to Bill Gross to cover both Bill and Everett's wages. The check was returned for insufficient funds, but Bill Gross indicates that Tolley paid him in cash for the returned check. On November 6, 1997, Tolley wrote a $3,000 check to Everett Gross for wages. This check was also returned for insufficient funds and Tolley has not made good on the check.

Tolley's conduct again violated Colo. RPC 8.4(b) (committing a criminal act that adversely reflects on a lawyer's fitness to practice); 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation); and C.R.C.P. 241.6(5) (committing a criminal act).

### F. The Elinsky Matter

Harry E. Elinsky entered into a real estate contract on February 10, 1997 with Linda B. Smith, a Florida resident. The contract involved the sale of residential property in Florida for $192,000. Nine thousand dollars of the purchase price was held in escrow with Elinsky's realtor, C–Land Realty.

On January 14, 1998, Tolley issued a personal check to C–Land Realty for the balance of $183,000. The check was returned on January 20 marked "non-sufficient funds." On or about January 26, 1998, the check was

returned a second time, marked "account closed."

The president of C–Land, Judith T. Copeland, sent a letter to Tolley on January 28, 1998, informing him that his $183,000 check had been returned twice, and demanding that Tolley wire $183,000 to C–Land's escrow account within twenty-four hours. Tolley responded the next day by a letter which stated:

> Thank you for your letter of January 28, 1998. Please accept my sincere apologies for the problems caused by the returned check. At this time, we are making every effort to send the funds in the near future. Unfortunately, due to problems completely unrelated to both yourself and Mr. Smith, our funds were delayed and are not expected until early next week. At that time, we intend to make full payment.

On February 9, Copeland demanded that Tolley wire $192,150 to her escrow account (representing $183,000 plus 5%) within thirty days. Tolley did not reply.

Elinsky filed an action against Tolley in a Florida circuit court on March 30, 1998. Tolley entered into a stipulated settlement on May 7, 1998, but failed to abide by its terms. Therefore, on July 7, 1998, the circuit count entered a default judgment against Tolley in the amount of $741,743.55, *nunc pro tunc* July 1, 1998. Tolley had not taken any steps to satisfy that judgment as of August 1998.

Tolley has admitted that his conduct violated Colo. RPC 8.4(b) (committing a criminal act that adversely reflects on a lawyer's fitness to practice); 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation); and C.R.C.P. 241.6(5) (committing a criminal act).

### III.

The inquiry panel in No. 97SA468 recommended that the respondent be suspended for thirty days. In No. 98SA508, Tolley has consented to disbarment.

Under the ABA *Standards for Imposing Lawyer Sanctions* (1991 & Supp.1992) (ABA *Standards* ), and in the absence of mitigating circumstances, disbarment is appropriate when, without the informed consent of the clients, the lawyer "(a) engages in representation of a client knowing that the lawyer's interests are adverse to the client's with the intent to benefit the lawyer or another, and causes serious or potentially serious injury to the client." ABA *Standards* 4.31; *see People v. Schindelar*, 845 P.2d 1146, 1149 (Colo. 1993) (entering into prohibited loan transaction with client, failing to disclose the inherent conflicts of interest involved, and not disclosing the inadequacy of the security for the loan warranted disbarment).

Furthermore, knowingly misappropriating client property almost invariably results in disbarment. *See* ABA *Standards* 4.11; *People v. Torpy*, 966 P.2d 1040, 1043 (Colo.1998). The factors in mitigation – the absence of prior discipline and cooperation in these proceedings, *see* ABA *Standards* 9.32(a), (e) – do not call for a lesser sanction. Accordingly, we accept the conditional admissions and order that the respondent be disbarred.

### IV.

It is hereby ordered that Royce Edward Tolley be disbarred, effective immediately upon the issuance of this opinion. Prior to readmission, and as a condition thereof, Tolley shall make restitution to the following parties in an amount satisfactory to each respective party: Mary Bloomquist, the Fore Group, the Berthoud Colorado Bondholders' Committee, Gregory and Ann Fulton, Mr. and Mrs. Reed, Everett Gross, and Harry E. Elinsky. Tolley is further ordered to pay the combined costs of these proceedings in the amount of $740.61 within thirty days after this opinion is announced to the Attorney Regulation Committee, 600 Seventeenth Street, Suite 200 South, Denver, Colorado 80202–5432.