**The PEOPLE of the State of Colorado, Complainant**

v.

**Daniel Richard CASIAS, Respondent.**

**No. 10PDJ102.**

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

Aug. 31, 2011.

## OPINION AND DECISION IMPOSING SANCTIONS PURSUANT TO C.R.C.P. 251.19(b)

### I. *SUMMARY*

■ After accepting an appointment by the Pueblo District Court to represent an indigent defendant, Respondent discussed with his client the prospect of converting to private representation. Respondent ultimately accepted a $5,000.00 retainer from the client, to whom he made statements implying that private representation would be superior to public representation. The People allege that Respondent violated five Rules of Professional Conduct: Colo. RPC 1.7(a)(2), 1.8(a)(1)-(3), 1.5(b), 8.4(c), and 8.4(d). Although the Hearing Board does not find clear and convincing evidence that Respondent violated the rules governing conflicts of interest, written fee agreements, or dishonest conduct, we do find that Respondent prejudiced the administration of justice by making misleading statements and acting in a manner that undermined the principles of Colorado's statutory scheme for the defense of indigent defendants. In light of Respondent's misconduct and the balance of aggravating and mitigating factors, we determine that public censure is the appropriate sanction.

### II. *PROCEDURAL HISTORY*

On September 22, 2010, the People filed their complaint in this matter. Respondent filed an answer on December 13, 2010.[1]

During the trial on June 9 and 10, 2011, the Hearing Board heard testimony and con-sidered the stipulated facts, stipulated exhibits 1–12, the People's exhibit 13, and Respondent's exhibits A and B.

### III. *FINDINGS OF FACT AND RULE VIOLATIONS*

The Hearing Board finds the following facts and rule violations have been established by clear and convincing evidence.

#### Jurisdiction

Respondent took the oath of admission and was admitted to the bar of the Colorado Supreme Court on May 17, 1976. He is registered upon the official records under attorney registration number 07300 and is thus subject to the jurisdiction of the Colorado Supreme Court and the Hearing Board in these disciplinary proceedings.[2] Respondent's registered business address is 1225 North Grand Avenue, Suite 205, Pueblo, Colorado 81003.

#### Representation of Jay Maestas[3]

In May 2009, Jay Maestas ("Maestas") was arrested and charged with multiple counts of felony possession of a controlled substance in two separate criminal matters in Pueblo District Court (case numbers 09CR725 and 09CR761), which were assigned to Judge Victor Reyes. Due to a conflict within the public defender's office, Judge Reyes appointed Respondent as alternate defense counsel ("ADC") for Maestas on August 17, 2009.

The Office of Alternate Defense Counsel ("OADC") was established to "provide legal representation in circumstances in which the state public defender has a conflict of interest in providing legal representation."[4] ADC attorneys are tasked with representing indigent clients "independently of any ... private interests" and "provid[ing] to indi-

---

1. On May 6, 2011, the People filed a motion in limine seeking to strike exhibits 1, 2, and 4 from the copies of Respondent's answer to be provided to the members of the Hearing Board. Following receipt of Respondent's response on May 26, 2011, the PDJ granted the People's motion on June 8, 2011.

2. *See* C.R.C.P. 251.1(b).

3. Except where otherwise noted, the facts in this section of the decision either are drawn from the parties' stipulated facts or are otherwise uncontroverted.

4. C.R.S. § 21–2–101(1).

gent persons accused of crimes legal services that are commensurate with those available to nonindigents. . . ." [5]

Pursuant to his contract with OADC, Respondent was eligible for payment from OADC of up to $3,000.00 per case, to be billed at an hourly rate of $65.00, with the possibility of additional fees upon OADC's approval.[6] Paragraph 2(d) of the contract provides: "When the Attorney is appointed to represent an individual in a criminal case, the Attorney shall not receive any fee or expense for representation of that individual in that case except as provided for under this agreement or as approved by [ ] OADC." [7] The contract also advises counsel that appointment as an ADC attorney "requires a substantial commitment to professional service in the public interest." [8]

Respondent appeared before Judge Reyes on Maestas's behalf multiple times between August 17, 2009, and November 3, 2009, and he also engaged in negotiations with Chief Deputy District Attorney Anthony Marzavas ("Marzavas") during that period. In September 2009, Marzavas offered a plea to possession of a schedule II substance (a class four felony), with four years in the custody of the Department of Corrections. Maestas rejected that offer.

In October 2009, Maestas told Respondent he was interested in hiring private counsel.[9] Respondent gave Maestas the names of several lawyers he could contact. In addition, Respondent and Maestas discussed the option of Maestas retaining Respondent as private counsel. Respondent orally informed Maestas of his fees as private counsel but admits he did not advise Maestas to speak to independent counsel regarding this possibility. Respondent characterized the conversation as "casual" and testified that he did not

believe Maestas truly intended to hire him as private counsel. Respondent also testified that Maestas's interest in hiring private counsel made some sense under the circumstances, since Maestas was deeply distrustful of anyone associated with the government, and Respondent stated he believed he would be better able to persuade Maestas of the benefits of accepting a plea offer in the role of private counsel. However, Respondent also insisted at the disciplinary hearing that he informed Maestas the quality of his representation would not improve if Maestas hired him as private counsel.

Maestas offered a very different account of this conversation, claiming that Respondent promised to arrange for Maestas to be placed on probation for $5,000.00 or secure the dismissal of all charges for $10,000.00. Maestas testified that, as a result of this discussion, he deduced Respondent was conspiring with Marzavas and possibly Judge Reyes in a scheme to fix his case in exchange for money. The Hearing Board notes that no other evidence in this proceeding, including the taped conversation and testimony from Marzavas and Judge Reyes, supports Maestas's conspiracy claim.[10] As such, the Hearing Board cannot credit Maestas's allegation that Respondent took the money as part of an agreement to bribe Marzavas. However, Respondent's testimony that he consistently and with conviction attempted to dissuade Maestas from retaining him as private counsel appears inconsistent with his recorded comments, and the Hearing Board finds the evidence inconclusive as to that part of the conversation.

On November 3, 2009, Maestas and Respondent met at the Pueblo District courthouse. Maestas made a sub rosa recording of his conversations with Respondent, Marza-

---

5. *Id.*

6. Ex. 13.

7. *Id.*

8. *Id.* ¶ 5.

9. The date of this meeting was not established with certainty in the stipulation of facts or at the hearing, but Respondent believes it occurred in October 2009.

10. Other incredible assertions made by Maestas evidence his highly suspicious nature. For example, in a letter to Judge Reyes admitted as exhibit A, Maestas alleges that Casias or Marzavas orchestrated death threats against him and his family and that Marzavas told him evidence had been planted on him because Maestas was friends with a certain individual.

vas, and court personnel that day.[11] At the courthouse, Maestas gave Respondent a $5,000.00 check, which was written by Maestas's parents and marked "retainer."[12] Respondent testified that he then attempted to return the check to Maestas, urging Maestas to keep the check if he was unsure about the arrangement. Respondent also claimed he advised Maestas several times that he could neither guarantee a better outcome nor provide higher-quality representation as private counsel. Respondent's purported efforts to return the check and his admonitions that the retainer would make no difference are not included on the recording, and the Hearing Board finds the evidence inconclusive as to whether they occurred.[13]

Maestas's recording captured the following dialogue on November 3, 2009:[14]

Maestas: ... remember we talked about the $5,000.00? You said $5,000.00. What's that gonna get me? That's five grand right there....

Respondent: That will give you the underlying privileges of private counsel rather than ... court-appointed counsel....

Maestas: And what does that do for me? Like, what am I gonna get out of this? I mean, cause I need to make sure that I ... am I gonna get a better deal? I want a better deal.

Respondent: I can't guarantee that, okay? All I can guarantee you is that I will, if you pay the higher amount per hour and you're hoping that I'll be better motivated to work harder for you. [*Maestas starts talking.*] I can't guarantee that. I can't guarantee that. I can't guarantee that. So if you want to pay me this retainer, you

can. But I will, ah, you know as I said, ah, as I said ...

Maestas: Well, you told me for $5,000.00 we can get something going better.... [*Maestas then makes several allegations regarding police mistreatment, to which Respondent responds non-committally. Respondent suggests there is a possibility Maestas could catch the police in a lie and "catch a break" but says he cannot guarantee it.*]

Maestas: Okay, but you said five grand would get me a better deal? Something ...

Respondent: No, I said five grand and we will go at it as hard as we can. Okay?

At the disciplinary hearing, Respondent testified that his comment regarding the "underlying privileges of private counsel" alluded to his added flexibility in obtaining investigators without approval and paying for expenses. Respondent also suggested that "underlying privileges" referred to the increased credibility he would have in Maestas's eyes as private counsel. However, the evidence does not reflect Respondent made any effort to obtain an investigator or incur other expenses in furtherance of Maestas's defense before or after November 3, 2009. Respondent also testified that his efforts would have been the same whether he was retained as ADC or private counsel, and there was no evidence that Respondent believed he lacked the resources to adequately represent Maestas as ADC counsel.

Respondent further testified that, at the time he accepted the $5,000.00 check, he did not consider the money to be his property; rather, he planned to place the retainer in his

11. The recording was admitted into evidence as exhibit 12.

12. Stipulation of facts; Ex. 2.

13. Although Respondent stipulated to the admission of exhibit 12, Respondent does not believe the recording includes the entirety of his discussions with Maestas at the courthouse on November 3, 2009. As noted above, Respondent maintains that he told Maestas he would not provide superior representation as private counsel. Since those comments are not heard on the recording, Respondent believes Maestas may have altered the recording. Maestas denies altering the recording, and the Hearing Board doubts

Maestas has the technical sophistication to do so. Because a significant proportion of the recording is indiscernible, we find the recording neither proves nor disproves that Respondent made such disclosures.

14. At the PDJ's request, both parties submitted transcripts of the relevant portions of the recording to aid the Hearing Board in its review. However, a key portion of the discussion is missing from Respondent's transcript. The transcription that appears below represents the Hearing Board's independent interpretation of the recording.

trust account and then draw upon it after entering into a contract with Maestas, moving to withdraw from representation as ADC counsel, notifying OADC, entering his appearance as private counsel, and then performing work on Maestas's behalf in his new capacity. Respondent understood at the time—and continues to believe—that his contract with OADC did not prevent him from transitioning to private representation in accordance with the process described above.

The director of OADC, Lindy Frolich ("Frolich"), testified that her office "frowns" on the possibility of an ADC attorney transitioning to private representation, and she is not aware of ADC attorneys having done so.[15] However, she believes such a transition is permissible if the attorney obtains leave of court to withdraw from ADC representation and then re-enters an appearance as private counsel. According to Frolich, paragraph 2(d) of the OADC contract, which limits an ADC attorney's permission to receive nonOADC fees, prohibits an ADC attorney from receiving OADC payment and billing the client *at the same time*. She does not believe an ADC attorney would violate that provision merely by placing a retainer into a trust account.

That same day, after Respondent accepted the $5,000.00 retainer, Respondent and Marzavas engaged in further negotiations at the courthouse. Marzavas made a revised plea offer: if Maestas pled guilty to possession of a schedule II substance (a class four felony), he would serve no time in prison and the district attorney's office would dismiss the charges in case number 09CR761; however, Judge Reyes would have the option to sentence Maestas to either probation or community corrections.[16]

Respondent testified that, once he relayed Marzavas's offer, Maestas questioned whether Respondent had truthfully conveyed the offer and suggested Marzavas might offer a better deal if he knew Maestas's parents were ill. Respondent also testified that he viewed the deal as favorable for Maestas, partly because Judge Reyes customarily assigned harsh sentences in drug distribution cases. Respondent took what he characterized as the "extraordinary step" of initiating a three-way conversation between himself, Maestas, and Marzavas so that Marzavas could confirm the details of his offer and Maestas could personally relate his parents' health problems. At the conclusion of that discussion, Maestas rejected the offer.

After returning to his office on November 3, 2009, Respondent prepared a letter to Maestas acknowledging his receipt of the $5,000.00 retainer.[17] The letter states that Respondent planned to deposit the retainer into his trust account, and Respondent in fact did so promptly. The letter further explains that Respondent would draw upon the retainer at the hourly rate of $175.00 as he performed work on the case. Respondent anticipated providing the letter to Maestas that afternoon or the next day at his office.[18] However, Respondent did not at this or any later date advise Judge Reyes or OADC that he had received a retainer from Maestas. Judge Reyes testified that, had Respondent wished to make a record of his contemplated transition to private representation, he would have been available to hold a hearing on the matter on November 3, 2009.

For his part, Maestas testified he never intended to hire Respondent as private counsel; rather, he suggested that he gave Respondent the check in order to obtain recorded evidence of Respondent's alleged extortionary efforts. In accordance with this stratagem, Maestas's parents placed a stop payment order on the check on November 3,

---

15. Respondent, however, testified that he converted from ADC representation to private representation in a previous case, and he believes other attorneys have done the same.

16. Marzavas altered the plea offer after learning that Maestas had not been on bond when he was arrested for the second matter.

17. Stipulation of facts; Ex. 3.

18. Respondent testified that he asked Maestas to visit his office that afternoon, but Maestas has no recollection of that discussion. In Respondent's response to the request for investigation, Respondent states that he expected Maestas to visit his office the next day, as Maestas typically appeared unannounced at his office the day after court proceedings.

2009, at Maestas's direction.[19] After their November 3, 2009, discussions at the courthouse, Respondent and Maestas never again spoke.

Respondent penned a letter to Maestas on November 18, 2009, stating: (1) he understood that the stop payment order placed on the $5,000.00 check reflected Maestas's decision not to retain him as private counsel, given his previous advice that he "could make no guarantees as to a different outcome," (2) had the check cleared, he would have withdrawn as ADC counsel and entered his appearance as private counsel, and (3) he would remain as ADC counsel unless Maestas advised him that he had retained other counsel.[20]

Judge Reyes removed Respondent from Maestas's case in December 2009 after receiving a letter from Maestas. Judge Reyes testified he made the decision based upon his understanding that Maestas and Respondent's relationship had "broken down" and his concern regarding Maestas's allegations that Respondent had promised to provide better representation as private counsel.[21] Judge Reyes stated that it is common for defendants to file motions expressing dissatisfaction with their counsel, and had he received only the letter from Maestas, he would have held a hearing to determine the status of the attorney-client relationship. However, Respondent's acceptance of the check caused him enough concern that he decided to remove Respondent from the case.[22]

We turn now to an analysis of the five claims pled in the People's complaint. In Claim I, the People contend that Respondent had a concurrent conflict of interest in representing Maestas because he stood to gain financially from enlisting as private counsel, which materially limited the representation. Colo. RPC 1.7(a)(2) prohibits a lawyer from engaging in a representation involving a "concurrent conflict of interest," and it defines that term to include a "significant risk" that the representation of a client will be "materially limited" by a personal interest of the lawyer. Respondent contends he had no financial interest in switching to private representation. He reasons that—even though his private hourly rate dwarfed his ADC hourly rate—Maestas was unlikely to pay additional fees if Respondent's charges exceeded $5,000.00, while as an ADC lawyer he probably could have obtained permission to exceed the fee cap of $6,000.00.

■ Although the Hearing Board is not entirely persuaded by Respondent's contention that he would earn less as private counsel than as ADC counsel,[23] we cannot find that Respondent violated Colo. RPC 1.7(a)(2). The evidence shows it was Maestas's idea that Respondent represent him as private counsel. And although we agree with the People that Respondent likely stood to benefit financially by shifting to private representation, we cannot find clear and convincing evidence of a "significant risk" this interest "materially limited" Respondent's representation of Maestas. Colo. RPC 1.7 is designed to ensure that lawyers provide loyal representation and exercise independent judgment on their clients' behalf.[24] Here, there is no reason to believe that the prospect of a transition to private representation would have impinged upon Respondent's judgment or his loyalty to Maestas. True, Respondent might

---

19. Respondent testified that his bank informally notified him "almost immediately" of the stop payment order, and the parties' stipulation of facts indicates that Respondent's bank officially notified him of the stop payment order in a letter dated November 12, 2009. The Hearing Board finds the evidence inconclusive as to when Respondent learned of the stop payment order.

20. Stipulation of facts; Ex. 6.

21. Judge Reyes and Respondent did not discuss this issue before Judge Reyes rendered his decision.

22. Judge Reyes's testimony evinced no concern that the bribery claims alleged in Maestas's letter were truthful. Rather, his testimony indicated he acted based upon the implication in the letter that Respondent had accepted a retainer after representing to Maestas he could do a better job as private counsel.

23. Respondent could have earned fees far more quickly at his private hourly rate of $175.00 than at his ADC hourly rate of $65.00, and there was a significant possibility that his representation would have terminated before reaching the cap.

24. Colo. RPC 1.7 cmt. 1.

have been able to earn greater fees by prolonging the resolution of Maestas's case until he could charge Maestas at his private rate.[25] But a mere interest in earning legal fees does not give rise to a cognizable conflict of interest; indeed, lawyers in private practice continually face financial incentives to perform additional legal work. Accordingly, we find no violation of Colo. RPC 1.7(a)(2) here.

■ In Claim II of their complaint, the People argue that Respondent violated subsections (1) through (3) of Colo. RPC 1.8(a), which bar a lawyer from entering into a business transaction with a client or knowingly acquiring a pecuniary interest adverse to a client unless the applicable terms are fair and reasonable to the client, the lawyer transmits the terms to the client in writing, the client gives informed consent to the terms, and the lawyer advises the client in writing of the desirability of seeking independent legal advice. The People contend Respondent failed to comply with this rule by entering into a new fee agreement to represent Maestas as private counsel without having provided the disclosures and safeguards outlined in Colo. RPC 1.8(a)(1)-(3).

The People appear to rely on a novel theory of Colo. RPC 1.8(a), under which a lawyer's mere entry into a fee agreement or modification thereof triggers the application of the rule. The Hearing Board has not identified—nor have the People cited—any Colorado Supreme Court cases holding that Colo. RPC 1.8(a) applies when a lawyer and client enter into or modify a fee agreement. Rather, the Colorado Supreme Court has applied Colo. RPC 1.8(a) in circumstances wholly distinct from those presented here,

such as where a lawyer secured a legal fee by taking a deed of trust in a client's property[26] or accepted a loan from a client.[27] In fact, comment 1 to Colo. RPC 1.8 states that the disclosures and safeguards required for business transactions between a client and lawyer do not apply in the case of "ordinary fee agreements between client and lawyer, which are governed by Rule 1.5...." Given the dearth of legal authority supporting the application of Colo. RPC 1.8(a) under the circumstances presented here, we find the People have not proved Respondent was in violation of this rule.

■ Next, the People assert in Claim III that Respondent violated Colo. RPC 1.5(b), which provides that a lawyer who has not regularly represented a client must give that client a written explanation of his or her fees and expenses before or within a reasonable time after commencing the representation. We cannot find that Respondent "commenced" a new representation of Maestas as private counsel. The Colorado Supreme Court has held that an important factor in ascertaining whether an attorney-client relationship has been established is the subjective belief of the client.[28] Here, Maestas testified that he never intended to hire Respondent as private counsel. Several other factors suggest, under the particular circumstances of this case, that a new representation did not commence: Respondent never performed work on Maestas's behalf after November 3, 2009, he never charged Maestas at his private rate, and he never assumed possession of the retainer, since he merely deposited it in his trust account.[29] The

---

25. The Hearing Board notes there is no evidence that Respondent attempted to protract his representation of Maestas. To the contrary, immediately after receiving the $5,000.00 check, Respondent strongly encouraged Maestas to accept a plea offer.

26. *In re Fisher*, 202 P.3d 1186, 1190, 1196 (Colo. 2009).

27. *In re Tolley*, 975 P.2d 1115, 1117 (Colo.1999); *People v. Foreman*, 966 P.2d 1062, 1063–64 (Colo.1998); *People v. Robertson*, 908 P.2d 96, 99 (Colo.1995).

28. *People v. Bennett*, 810 P.2d 661, 664 (Colo. 1991); *see also In re Rossana*, 395 B.R. 697, 702

(Bkrtcy.D.Nev.2008) ("the attorney-client relationship is based on the subjective belief of the client"); *The Fl. Bar v. Beach*, 675 So.2d 106, 109 (Fla.1996) ("The test for determining the existence of this fiduciary relationship is a subjective one and hinges upon the client's belief that he is consulting a lawyer in that capacity and his manifested intention is to seek professional legal advice.") (quotations omitted); *Bohn v. Cody*, 119 Wash.2d 357, 832 P.2d 71, 75 (1992) ("The existence of the [attorney-client] relationship turns largely on the client's subjective belief that it exists.") (quotation omitted).

29. *See* Colo. RPC 1.15.

Hearing Board therefore finds no violation of Colo. RPC 1.5(b) in this matter.[30]

■ The Hearing Board now turns to Claim IV, which alleges that Respondent violated Colo. RPC 8.4(c). That rule prohibits lawyers from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation. In their complaint, the People allege that Respondent: (1) "acted in a dishonest and deceitful manner towards Maestas by agreeing to represent Maestas under his contract as [ADC], and then advising Maestas he would be better motivated by more money," and (2) "engaged in conduct involving dishonesty, fraud, deceit or misrepresentation towards the court and OADC by having indicated to the court and [ ] OADC that he would accept ADC appointments, and then agreeing to accept private pay from an ADC client." In their hearing brief and at the hearing, the People advanced the additional argument that, by failing to notify the court or OADC he had accepted the $5,000.00 check, Respondent engaged in dishonesty by omission.

Although, as discussed below, we are deeply distressed by Respondent's failure to clearly communicate to Maestas that he was obligated to provide commensurate legal services whether as ADC or private counsel, we cannot find that Respondent was dishonest towards Maestas as pled in paragraph 56 of the People's complaint.

This paragraph alleges that Respondent acted dishonestly and deceitfully by agreeing to represent Maestas as ADC counsel and then advising Maestas he would be "better motivated by more money." Paragraph 56 rests upon the theory that Respondent attempted to persuade Maestas he would pro-vide better representation as private counsel, and that Respondent was doing so for financial gain. However, there is no evidence Respondent instigated the proposal or was attempting to profit by it. Respondent gave Maestas the names of other attorneys to contact before discussing the possibility of converting to private representation, and the recording shows it was Maestas who raised the issue of the retainer at the courthouse. Moreover, although Respondent's efforts to dissuade Maestas from hiring him as private counsel were lukewarm at best, the picture that emerged from the hearing was that Maestas approached Respondent to try to retain him as private counsel, and Maestas repeatedly asked what he would receive in return. In other words, we are not facing a case in which an ADC attorney contrived to make money by persuading an indigent client that he would provide superior representation if he were privately paid.

This does not mean we are not troubled by Respondent's statements and conduct. Respondent knew that his level of representation would not (or should not) be any different, yet he told Maestas he would receive "the underlying privileges of private counsel rather than ... court-appointed counsel," recognizing his client was already inclined to believe ADC representation was inferior. The Hearing Board believes that this statement and Respondent's remark, "I said five grand and we will go at it as hard as we can," coupled with the fact that Respondent took the retainer, constituted misleading conduct that Respondent should have known would confirm his client's suspicions regarding the advantages of private counsel.[31] We address this theory below; however, the People alleged in paragraph 56 more serious, purpose-

---

30. Even if Respondent and Maestas had entered into a new representation, it is not clear Respondent exceeded the reasonable period permitted by the rule for a lawyer to give a client written information concerning fees. In addition, we note Respondent took steps toward complying with this rule by drafting a letter to Maestas on November 3, 2009, in which he explained that he would withdraw funds from the retainer at an hourly rate of $175.00, including travel time, that Maestas would be liable for any fees exceeding $5,000.00, and that Maestas would be entitled to the return of any unearned fees upon termination of the representation. Ex. 3.

31. Maestas testified that he gave Respondent the check in order to prove his conspiracy theory. Respondent clearly did not comprehend at the time that the transaction was part of a "sting." Respondent did, however, testify that it was common for indigent defendants to perceive public attorneys to be inferior, and he believed the motive behind Maestas's insistence that he convert to private representation was Maestas's expectation that he would receive better representation.

fully deceitful conduct, and the Hearing Board does not find that this violation as alleged was proved by clear and convincing evidence.

Neither can we find that the People's assertion in paragraph 57 of the complaint—that Respondent was dishonest toward the court and OADC—gives rise to a cognizable violation of Colo. RPC 8.4(c). Frolich testified that ADC attorneys are permitted under the terms of their contract with OADC to transition to private representation. Moreover, the fact that Respondent took steps toward converting to private representation of Maestas does not necessarily mean he was untruthful when he earlier expressed willingness to act as ADC counsel. In fact, we find it very likely that Respondent entered into representation of Maestas as ADC counsel with every intention of continuing to represent him in that capacity through the conclusion of his cases.

The Hearing Board has some concern about entertaining the theory of Claim IV presented for the first time in the People's hearing brief,[32] but consideration of this theory does not alter our conclusion regarding Claim IV. Although it would have been prudent for Respondent to have immediately informed Judge Reyes and OADC that he had accepted a check from Maestas, we cannot find by clear and convincing evidence that his failure to do so amounted to dishonesty. There is no evidence that Respondent meant to mislead either the court or OADC.[33] To find that Respondent violated Colo. RPC 8.4(c) by not acting on one of his first opportunities to inform the court and OADC of his receipt of the check would require us to adopt an overly strict interpretation of the rule. Thus, we determine that Respondent did not violate Colo. RPC 8.4(c).

■ Finally, the People assert in Claim V that Respondent engaged in conduct prejudicial to the administration of justice in violation of Colo. RPC 8.4(d). The People argue

Respondent conveyed to Maestas that his efforts as a private lawyer would be superior to his efforts as ADC counsel. They urge the Hearing Board to find Respondent was obligated, but failed, to clearly inform Maestas that he would provide the same quality of representation as either ADC or private counsel. For his part, Respondent emphasizes that he repeatedly advised Maestas he "could not guarantee" a better outcome, and he asseverates that he fully disclosed his obligations to Maestas in earlier discussions not captured on Maestas's surreptitious recording.

Claim V is the People's strongest. We are particularly troubled by Respondent's statements that hiring private counsel would confer "underlying privileges" and that, if he were private counsel, "[they] would go at it as hard as [they could]." These statements, coupled with Respondent's acceptance of Maestas's check, created the impression that Respondent would in fact provide better representation as private counsel. This was all the more detrimental because the conversation captured on the recording shows that Maestas believed private representation would be superior to ADC representation. Although Respondent told Maestas he could guarantee no better outcome, he did not attempt to disabuse Maestas of his perception that he would, as private counsel, provide a superior defense than he would as appointed counsel. By failing to tell Maestas that as ADC counsel he would do the very best job he could within the bounds of the law—in fact, the *same* job—and by accepting Maestas's proffered check, Respondent confirmed Maestas's belief that he would in fact receive better representation in exchange for payment.

Respondent's words and actions undermined the principles of Colorado's statutory scheme for the defense of indigent defendants, eroded public trust in that system, and contributed to the misconception to which

---

32. *See In re Green,* 11 P.3d 1078, 1088 (Colo. 2000) (noting "a lawyer may not be disciplined for misconduct that is not charged in the complaint") (citing *In re Ruffalo,* 390 U.S. 544, 551, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968)).

33. Frolich testified that an ADC lawyer may convert to private representation upon court approval and OADC lacks authority to disapprove such a conversion. Her testimony suggests Respondent was not obligated to immediately notify OADC of his receipt of Maestas's retainer.

several witnesses in this hearing testified: indigent defendants perceive that they receive a more zealous defense from retained attorneys than from court-appointed counsel. Respondent's conduct also affected his relationship with his client and caused the court sufficient concern that it removed Respondent from the case. Such conduct prejudices the administration of justice "if for no other reason than because of the belief it likely will instill in the defendant that the quality of his representation may yet depend upon gathering together funds to compensate the attorney whom he has not selected." [34] As such, Respondent violated Colo. RPC 8.4(d).[35]

We recognize that Respondent testified his recorded statements were made against a backdrop of other disclosures indicating Maestas would gain no advantage by hiring Respondent as private counsel. As noted above, we find the evidence inconclusive as to whether Respondent made such disclosures. Yet even if we credited Respondent's testimony on this score, we still would find that his recorded statements—together with acceptance of the $5,000.00 check—amounted to conduct prejudicial to the administration of justice. Given Maestas's deep distrust of government, Respondent had a heightened obligation to accurately characterize his professional obligations in his discussions with Maestas. He also had a duty to either reject the check when it was proffered or timely seek judicial approval of a change in his status from ADC to retained counsel, which would have allowed the court to question Maestas about his reasons for making the change. Through his acts and omissions, Respondent engaged in conduct prejudicial to the administration of justice.

## IV. SANCTIONS

■ The American Bar Association *Standards for Imposing Lawyer Sanctions* (1991 & Supp.1992) ("ABA *Standards*") and Colorado Supreme Court case law govern the selection and imposition of sanctions for law-

yer misconduct. ABA *Standard* 3.0 mandates that, in selecting the appropriate sanction, the Hearing Board consider the duty breached, the injury or potential injury caused, Respondent's mental state, and the aggravating and mitigating evidence.

### ABA *Standard* 3.0—Duty, Mental State, and Injury

*Duty:* Respondent violated the duty he owed to the legal system to uphold this state's statutorily adopted goal of providing commensurate representation to indigent persons accused of crimes.

*Mental State:* Respondent should have known, by virtue of his extensive experience as ADC counsel, that he was obligated to uphold the statutory goals of the ADC program. We find that Respondent failed to heed a substantial risk that his comments and conduct would lend credence to Maestas's beliefs regarding the inferior quality of ADC representation. By doing so, he departed from the standard of care a reasonable lawyer would exercise in this situation.

*Injury:* Respondent caused harm by perpetuating a commonly held belief among criminal defendants that court-appointed attorneys lack the talent and zeal of private attorneys. If indigent persons charged with crimes believe they will not receive competent representation from court-appointed attorneys, they may take extraordinary measures to scrape together or borrow money to pay private attorneys, even if they are legitimately entitled to a defense at public expense. In addition, defendants may fail to heed sound advice given to them by court-appointed attorneys if they doubt the competency of such attorneys.

### ABA *Standard* 3.0—Aggravating Factors

■ Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. The Hearing Board considers evi-

---

34. *See In re L.R.,* 640 A.2d 697, 701 (D.C.1994) (quotations omitted).

35. *See Byrdsong v. State,* 822 So.2d 470, 474 (Ala.Crim.App.2000) ("A trial counsel's solicita-

tion or acceptance of payment after counsel has been appointed to represent an indigent defendant is highly unethical and merits the strongest condemnation.").

dence of the following aggravating circumstances in deciding the appropriate sanction.

*Prior Disciplinary Offenses—9.22(a):* In 1982, Respondent was publicly censured after pleading guilty to having willfully distributed anonymous statements concerning a candidate for public office. Respondent distributed a letter containing accusations against a candidate for District Attorney and then, during the course of a police investigation, destroyed evidence and misrepresented his handwriting. The Colorado Supreme Court determined that this conduct involved dishonesty, fraud, deceit, or misrepresentation and prejudiced the administration of justice. In addition, Respondent received a letter of admonition in 1981. In that matter, he prejudiced the administration of justice by advising his clients to file a grievance against an adversary attorney in order to gain an advantage in litigation.

*Dishonest or Selfish Motive—9.22(b):* The Hearing Board finds that Respondent's comments to Maestas were misleading. We also find that Respondent acted in a somewhat selfish manner by failing to persist in educating Maestas about ADC attorneys' obligation to provide zealous representation and by accepting the check. Respondent took the course of least resistance, to the legal system's detriment.

*Vulnerability of Victim—9.22(h):* Given Maestas's surreptitious recording and his efforts to take advantage of Respondent, we recognize that he is not the most sympathetic of clients. But we do find him to be a somewhat vulnerable victim in light of his mental state. Maestas's testimony and his letter to Judge Reyes reflect deep-seated suspicions about the integrity of the judicial system that compromised his ability to assist

in his own defense. As such, he was particularly susceptible to the misconduct at issue in this matter.

*Substantial Experience in the Practice of Law—9.22(i):* Respondent was admitted to the Colorado bar in 1976. His misconduct ill befits such a longstanding practitioner.

### ABA *Standard* 3.0—Mitigating Factors

Mitigating factors are any considerations or factors that may justify a reduction in the degree of discipline imposed. The Hearing Board considers evidence of the following mitigating circumstances in deciding the appropriate sanction.

*Character or Reputation—9.32(g):* At the disciplinary hearing, two witnesses testified to Respondent's character and reputation.[36]

David Cole ("Cole"), a semi-retired judge, testified by telephone. Before sitting on the county and district court benches in Pueblo, Cole practiced law in the Pueblo district attorney's office, in the city attorney's office, and in private practice. He has known Respondent for over twenty years in personal and professional capacities. During that period, Cole has worked with Respondent as co-counsel, supervised him, heard cases in which he appeared, and appointed him as ADC counsel in approximately twenty to twenty-five cases. Cole testified that he believes Respondent is one of the most ethical and honest attorneys who has appeared before him, and that he enjoys one of the highest reputations for honesty in the Pueblo legal community. However, Cole conceded that it would change his opinion to know that Respondent advised Maestas that hiring him would confer "underlying privileges." [37]

---

36. Respondent sought to present character testimony at trial from two sitting judges and three retired judges. The People objected to such testimony, citing Canon 3.3 of the Colorado Code of Judicial Conduct, CRE 403, and *People v. Morley*, 725 P.2d 510 (Colo.1986). For his part, Respondent argued that the judges he sought to call were the most knowledgeable witnesses available and that they were familiar with his character based both on their judicial experience and their prior interactions with him. The PDJ determined that testimony from all five judges would be cumulative, but he permitted Respondent to call two judges as character witnesses. After

determining that neither Hearing Board member had cases pending before the testifying judges, he instructed the Hearing Board members that they should not ascribe any additional weight to the judges' testimony based upon their office.

37. Cole also testified when cross-examined by the People that it would alter his opinion to know Respondent had said to Maestas: "All I can guarantee you is that I will, if you pay the higher amount per hour and you're hoping that I'll be better motivated to work harder for you."

Rosalie Vigna ("Vigna"), a retired judge, also testified by telephone as to Respondent's character and reputation. Vigna is acquainted with Respondent through her experience as a district court judge and her previous private practice. Respondent appeared in her courtroom often, particularly in criminal matters and dependency and neglect cases. In some instances, she appointed Respondent as ADC counsel. Vigna opined that she and the broader Pueblo legal community view Respondent as an honest and ethical lawyer. She further testified that Respondent's comment to Maestas regarding the "underlying privileges" of private counsel does not alter her opinion because that opinion is based upon thousands of interactions with Respondent.

In light of this evidence, we accord some weight in mitigation to Respondent's reputation and character.

*Remoteness of Prior Offenses—9.32(m):* The Hearing Board recognizes that Respondent has not been disciplined since the early 1980s. However, we still give some weight to his prior discipline as an aggravating factor because his prior misconduct, like the misconduct at issue in this matter, involved conduct prejudicial to the administration of justice.

## Sanctions Analysis under ABA *Standards* and Case Law

According to Appendix 1 to the ABA *Standards,* ABA *Standard* 6.0 governs the imposition of sanctions for a lawyer's violation of Colo. RPC 8.4(d). Three types of misconduct are encompassed within ABA *Standard* 6.0: false statements, fraud, and misrepresentation made to a court (ABA *Standard 6.1* ); abuse of the legal process involving failure to expedite litigation or bring a meritorious claim, or failure to obey an obligation under the rules of a tribunal (ABA *Standard 6.2* ); and attempts to influence a judge, juror, prospective juror, or other official by illegal means (ABA *Standard 6.3* ). Under ABA *Standards* 6.1—6.3, intentional misconduct warrants disbarment, knowing misconduct merits suspension, negligent misconduct justifies public censure, and an isolated instance of negligence calls for private admonition. Similarly, each of these standards suggests that disbarment is appropriate when misconduct causes serious injury or potential injury, suspension or public censure are proper when misconduct causes injury or potential injury, and private admonition is sufficient when misconduct causes little injury or potential injury.

We are unaware of any Colorado Supreme Court case law that concerns factual circumstances similar to those presented here, but several decisions from other jurisdictions are instructive. The District of Columbia Court of Appeals' *L.R.* decision concerns a lawyer appointed to litigate an appeal of an indigent client's prison sentence.[38] The lawyer agreed to file a motion asking the superior court to reduce his client's sentence in exchange for $200.00, although he subsequently refused to perform additional services on the client's behalf in exchange for payment.[39] The lawyer claimed he was unaware of a statutory prohibition against accepting payment or promise of payment from an indigent client an attorney had been appointed to represent.[40] The court deemed an informal admonition an appropriate sanction, and it gave some weight to the lawyer's claim that he had a good faith misunderstanding about the statutory restriction on accepting payment.[41]

In the *Singer* matter, decided by a federal court in New York, a court-appointed attorney accepted payments totaling about $10,000.00 over a four-year period from an indigent client.[42] The lawyer explained that he and his client had agreed to private representation rather than court-appointed representation and that he was unaware he needed court approval to transition to private repre-

**38.** *In re L.R.,* 640 A.2d 697, 698 (D.C.1994).

**39.** *Id.* at 698–99.

**40.** *Id.* at 699–701.

**41.** *Id.* at 701.

**42.** *In the Matter of Singer,* 185 F.Supp.2d 313, 314 (S.D.N.Y.2002).

sentation.[43] Although he did not seek compensation as appointed counsel, he received a court transcript at public expense.[44] In addition, the client testified that the lawyer had told him he "would do a better job if [the client] paid him...."[45] After taking into account evidence of the lawyer's "high level" of representation of many indigent clients, the court imposed a one-year suspension.[46]

The Supreme Court of Louisiana decided a similar matter in the *Barstow* decision.[47] There, a lawyer had been appointed to represent an indigent client in a capital case, yet he accepted a $10,000.00 payment from his client's parents.[48] The court declined to find that the lawyer had extorted a fee or promised a better result in exchange for a fee, but the court did conclude the lawyer had prejudiced the administration of justice by failing to inform the court and his employer that he had accepted a fee.[49] Although "there was no explicit provision of law requiring [the lawyer] to give notice of the fee at the time he accepted it," the lawyer was subject to an "implicit duty" to provide such notice, since "the acceptance of a private fee ... is a fact relevant to the representation...."[50] After taking into account several aggravating and mitigating circumstances, the court determined the appropriate sanction was a deferred three-month suspension and a year-long probationary period.[51]

The Hearing Board deems Respondent's misconduct and the balance of aggravating and mitigating factors to be more serious than in *L.R.*, where the court imposed a lenient sanction of an informal admonition based upon the lawyer's good-faith misunderstanding regarding his constraints and his lack of prior discipline.[52] Yet Respondent's misconduct was not as egregious as that in *Singer*, where the lawyer accepted cash payments over a four-year period without informing the court and benefited from a transcript provided at court expense.[53] Thus, the sanction imposed in *Singer*—a one year suspension[54]—would be unduly harsh here. Finally, the *Barstow* court imposed a deferred three-month suspension on the basis of the lawyer's continuing failure to advise the court of his acceptance of a fee—also a lengthier and more pronounced instance of misconduct than that presented here.[55]

In view of the presumptive sanctions provided in ABA *Standards* 6.1–6.3, sanctions imposed in similar cases, and the balance of aggravating and mitigating factors in this matter, the Hearing Board finds that a public censure is warranted.

## V.  CONCLUSION

Respondent failed to clearly inform his client that he was obligated to provide commensurate representation whether he was acting as ADC or private counsel, and he indulged his client's belief in the inferiority of ADC representation. In so doing, Respondent undermined the goals of Colorado's system of public representation and prejudiced the administration of justice. We publicly censure Respondent for this misconduct.

Concurrence by WILLIAM R. LUCERO, Presiding Disciplinary Judge:

I concur with the Hearing Board's conclusions with respect to Claims I–IV. With respect to Claim V, I concur in the Hearing Board's determination that Respondent violated Colo. RPC 8.4(d), but I write separately to explain the theory under which I believe the People have proved this claim.

43.  *Id.*

44.  *Id.*

45.  *Id.* at 314–15.

46.  *Id.* at 315.

47.  *In re Barstow*, 817 So.2d 1123 (La.2002).

48.  *Id.* at 1124–25.

49.  *Id.* at 1129.

50.  *Id.*

51.  *Id.* at 1130.

52.  *See* 640 A.2d at 701.

53.  *See* 185 F.Supp.2d at 314.

54.  *Id.* at 315.

55.  817 So.2d at 1130.

Like my fellow Hearing Board members, I am troubled by Respondent's statements that hiring him as private counsel would confer "underlying privileges" and that, if he were private counsel, "[he and Maestas] would go at it as hard as [they could]." Respondent's comments are disquieting because they could be read to suggest Respondent lacked a personal commitment to OADC's statutory goal of providing commensurate services to indigent persons. I agree with my fellow Hearing Board members that these statements could be interpreted as an indication Respondent would be motivated to do a better job if his client paid him for his services. I do not, however, share the perspective that Respondent's recorded comments were "misleading." And although Respondent's surreptitiously captured statements to his vulnerable client were ill-advised, I wish to underscore the Hearing Board's determination that they do not *alone and apart from context* amount to a clear and convincing violation of Colo. RPC 8.4(d).

According to Respondent, he previously informed Maestas he was obligated to provide the same quality of representation whether he was acting as ADC or private counsel. If, as I believe, Respondent in fact made those disclosures, Maestas would have received largely accurate information about Respondent's duties, and his statements regarding "underlying privileges" and "going at it hard"—though inapt—would most properly be viewed as incomplete and poorly articulated remarks by a lawyer trying to deal with a client who refused to seriously consider an apparently fair and reasonable plea offer.

While Respondent's testimony included some inconsistent and vague statements, he is much more credible than Maestas. Two judges testified to Respondent's good reputation in the legal community. Maestas, on the other hand, is a convicted felon[56] who has made uncorroborated allegations of systemic corruption in the Pueblo judicial and prosecutorial systems. The evidence makes clear that Maestas was desperately seeking a way to avoid incarceration, even if it meant making groundless allegations against the prosecutor handling his matter and the judge trying the case. Given the evidence suggesting that Respondent provided proper disclosures to Maestas before November 3, 2009, I do not find Respondent's recorded statements, standing alone, to provide clear and convincing evidence of conduct prejudicial to the administration of justice.

In my mind, the gravamen of the misconduct here is Respondent's decision to accept the $5,000.00 check from Maestas, a client he had agreed to represent upon the terms and conditions of a court appointment. As ADC counsel and an officer of the court, Respondent should not have accepted any remuneration from his client until the appointing court was fully advised of the circumstances and had released him from his duties as ADC counsel. Respondent's failure to act in a transparent manner gives rise not only to an appearance of impropriety but also to a violation of Colo. RPC 8.4(d). I agree with my fellow Hearing Board members that, particularly in light of Respondent's similar prior discipline, public censure is the appropriate sanction here.

## VI. *ORDER*

The Hearing Board therefore **ORDERS**:

1. **DANIEL RICHARD CASIAS,** attorney registration number 07300, is **PUBLICLY CENSURED.** The **PUBLIC CENSURE SHALL** take effect only upon issuance of an "Order and Notice of Public Censure."[57]

56. A witness's prior felony conviction may properly be adjudged to reflect upon the likely truthfulness of his or her testimony. *See* C.R.S. § 13-90-101 (providing that "the conviction of any person for any felony may be shown for the purpose of affecting the credibility of such witness"); *People v. Harding,* 104 P.3d 881, 887 (Colo.2005) (noting that a jury may draw from a prior felony conviction "the inference that a witness who disobeyed a social norm in the past may be violating another norm by lying now") (quotation omitted).

57. In general, an order and notice of sanction will issue thirty-one days after a decision is entered pursuant to C.R.C.P. 251.19(b) or (c). In some instances, the order and notice may issue later than thirty-one days by operation of C.R.C.P. 251.27(h), C.R.C.P. 59, or other applicable rules.

2. Respondent **SHALL** file any post-hearing motion or application for stay pending appeal with the PDJ **on or before Tuesday, September 20, 2011.** No extensions of time will be granted. If Respondent files a post-hearing motion or an application for stay pending appeal, the People **SHALL** file any response thereto within five days, unless otherwise ordered by the PDJ.

3. Respondent **SHALL** pay the costs of these proceedings. The People **SHALL** submit a "Statement of Costs" within fifteen days from the date of this order. Respondent's response to the People's statement, if any, must be filed no later than ten days thereafter.

